**Affirmed and Memorandum Opinion filed December 22, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00584-CV

---

## IN THE INTEREST OF K.L. AND C.L., CHILDREN

---

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2020-01646J**

---

## M E M O R A N D U M   O P I N I O N

The trial court terminated Mother's parental rights to her children, Kate and Caleb,[1] on three predicate grounds, including endangerment by conduct. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O). The trial court also found that termination of Mother's parental rights was in the children's best interest and appointed the Department of Family and Protective Services (the "Department") as the children's sole managing conservator.

---

[1] We use pseudonyms to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's predicate and best-interest findings. Mother also challenges the trial court's failure to appoint her as the children's possessory conservator. Because we conclude sufficient evidence supports the trial court's endangering conduct and best-interest findings, as well as its failure to appoint Mother as a possessory conservator, we affirm the trial court's final order.

## BACKGROUND

In August 2020, the Department filed a petition requesting that the trial court order Mother and Father to participate in a family service plan. Approximately 15 months later, the Department filed a "First Amended Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship," requesting that the trial court (1) terminate Mother's and Father's parental rights with respect to Kate and Caleb, and (2) appoint the Department as the children's sole managing conservator. The parties proceeded to a bench trial in May 2022.

## I.    Evidence at Trial

Nine witnesses testified at the bench trial; we summarize the relevant portions of their testimony below.

### Symone Jones

Jones is employed by the Department and worked as "the family-based safety services worker for the majority of [Mother's and Father's] case." Jones said the Department received an intake report in June 2019, which alleged bruising on Mother's oldest son.[2] The Department recommended that Mother and Father

---

[2] The Department has not filed suit to terminate Mother's parental rights with respect to her oldest son.

2

complete a family service plan. At the time this investigation began, Kate was two years old and Caleb was 20 months.

Jones said that Mother had a "substantial CPS[3] history" that began years before the underlying June 2019 investigation. According to Jones, Mother has been involved in six CPS investigations; the first investigation concerned Mother's oldest son, who was born in 2014. Discussing this investigation, Jones said Mother tested positive for methamphetamines while she was pregnant and her son also tested positive for methamphetamines when he was born. Jones said the investigation was not completed because Mother "was moving around during that time." According to Jones, Mother "would move to different counties and homes to get another CPS worker and kind of get lost in the midst of it." Another investigation was initiated several months later, when it was alleged that Mother was not providing necessary medical care to her oldest son.

Jones said Mother's next CPS investigation was initiated in May 2017 and culminated in Mother's oldest son and Kate being removed from her care. According to Jones, Mother was pregnant with Caleb at this time and the Department was concerned that Mother again was using methamphetamines. Jones said Mother and Father completed their prescribed family service plan and the children were returned to them in September 2018.

Jones said the fourth CPS investigation began in October 2017, when Caleb was born. According to Jones, Mother admitted using methamphetamines while pregnant with Caleb. The fifth CPS investigation was initiated in December 2018, shortly after Mother's oldest son and Kate were returned to her care. Jones said the investigation began after Father was videotaped using a controlled substance

---

3 "CPS" refers to Child Protective Services.

3

while Mother's oldest son was in the room. Jones agreed that Mother "should have known" that Father was using drugs while her oldest son was staying with him.

After the current investigation was initiated in June 2019, Jones said Mother and Father "were slightly engaged in their services, but they weren't making their appointments regularly." Jones said Mother was arrested in Oklahoma in September 2019, for larceny, assault, and trespassing. Jones agreed that Kate and Caleb were in Mother's care at this time; Jones did not know where the children were when Mother was arrested.

Jones said the Department continued to work with Mother to complete her family service plan after her Oklahoma arrest, but Mother again was arrested in November 2019. Describing the arrest, Jones testified:

> What I remember about this case is that it was posted on Facebook Live and Mom was arrested. They found drugs, a loaded gun. In the video, there was a car seat noted in the vehicle, which brought concern because we didn't know where the children were at that time.

Jones said Mother was arrested and charged with possession with intent to deliver methamphetamines. Admitted into evidence was an "Order of Deferred Adjudication," which states that Mother accepted a plea bargain mandating an eight-year probation and a $3,000 fine. In addition to these two offenses, Jones said Mother "has [an] extensive criminal history involving theft offenses"; documents admitted into evidence showed Mother has at least eight theft convictions.

Describing other incidents, Jones said Mother traveled with the children "in the middle of the night" to Mississippi to be with her husband, James Yeager, in January 2020. According to Jones, this was concerning because Mother "was not supposed to be alone with the children" and "was not supposed to leave the state without notifying her caseworker." Jones said the Department also had concerns

4

about Yeager, particularly his "extensive criminal history" which included possession of a controlled substance and theft.

A drug test from May 2020 was admitted into evidence, which showed that Mother tested positive for amphetamines and methamphetamines. Jones said the Department received another intake report during this time, which alleged domestic violence between Mother and Yeager.

A second drug test from June 2020 was admitted into evidence and showed that Mother again tested positive for amphetamines and methamphetamines. Reviewing this test, Jones agreed that it showed Mother's drug levels "ha[d] actually increased." According to Jones, the Department implemented a Parental Child Safety Placement that required the children to live with a family member. However, Mother "removed the children and went to Huntsville." Jones said she went to pick up the children in Huntsville and returned them to the Parental Child Safety Placement.

Jones testified that the Department sought temporary managing conservatorship of Kate and Caleb in August 2020, noting "issues and instability" that had worsened. Jones said the children were placed with their Foster Parents.

Jones testified that she was familiar with the Foster Parents. According to Jones, Mother's oldest son and Kate had previously been placed with the Foster Parents in May 2017 when they first were removed from Mother's care. But even after the children were returned to Mother's care, Jones stated:

> that Mom would need time and needed breaks and that she would drop the children off at [the Foster Parents'] home, and so they would care for the children. They were emergency contacts when it came to day care. They were very heavily involved in helping the children.

Jones said Mother would leave the children with the Foster Parents "at least two to

three times a month." Jones agreed that it is "unusual" for a parent "to continue to have a previous foster parent essentially parent their children."

Jones testified that the Foster Parents have "provided a safe and stable environment" for Kate and Caleb. Jones said the Department has not had any concerns about the care provided by the Foster Parents. According to Jones, Mother has not shown that she can provide a safe and stable environment for Kate and Caleb. Jones ultimately opined that the children "would be in grave danger if they were returned back to [Mother] today."

### Cheryl Sanders

Sanders is a Department conservatorship worker and has been involved with Mother's case since its initiation. Noting that Mother has had "at least five" criminal cases, Sanders agreed that Mother's "criminal history is quite concerning." Sanders also reviewed evidence showing that Mother "currently has two active warrants in Harris County." When asked about the risks these warrants presented to Kate and Caleb, Sanders testified that Mother:

> could be arrested at any time and the children, if they were in her custody at that time, they will be taken — well, CPS will be called and they'll be back in custody. Again, not showing stability.

According to Sanders, Mother also had an open warrant in connection with her Oklahoma arrest that Mother took care of shortly before trial.

Sanders said Mother tested positive for methamphetamines in November 2020, shortly after the children had been removed from her care. Sanders agreed that this result showed that Mother was not taking the family service plan "seriously."

Describing the current family service plan, Sanders said Mother has completed most of its recommended services. Sanders testified that Mother

6

completed her substance abuse counseling and, throughout all of 2021, her drug tests were negative. Sanders said Mother also completed her individual counseling. But Sanders noted that Mother completed these services "at the very last minute," which did not indicate someone "who is serious about their sobriety and maintaining their sobriety." Rather, Sanders said this showed that Mother was repeating the "same pattern" where she would "do the bare minimum just to get CPS out of [her] li[fe] and the children returned." Continuing on, Sanders testified:

> The pattern that I've seen is that Mom will hurry up and finish the process and check the boxes, get the children back, and then, eventually, possibly relapse and get back to regular programming.

Sanders also said Mother did not satisfy the service plan's requirement to provide evidence of stable housing. Sanders said Mother gave the Department a copy of her current lease agreement; however, the Department was unable to confirm the lease with the property's landlord. According to Sanders, "the gentleman who signed off as the landlord or owner of the property is not the said owner of the property." Rather, the person who signed the lease agreement as the property's landlord was a person with a "criminal history of forging documents."

Sanders testified that Mother has not shown that she can provide a safe and stable environment for Kate and Caleb. Sanders said Mother has not expressed any plans for the children's futures nor has she expressed any hopes and dreams for them. Sanders agreed that returning to the children to Mother "would be detrimental to their physical and emotional well-being."

In contrast, Sanders said the Foster Parents can provide a safe and stable environment for Kate and Caleb. Sanders said she has made numerous announced and unannounced visits to the Foster Parents and, each time, the children have been

7

happy and well cared for. According to Sanders, the Foster Parents also have expressed hopes and dreams for the children's futures. Sanders testified that the children refer to the Foster Parents as "mom" and "dad" and "seem to love where they are." Sanders agreed that it would be in Kate's and Caleb's best interest to have Mother's parental rights terminated. Termination of Mother's parental rights, Sanders said, would "give[] the children a chance at a better life" with the Foster Parents.

*Mother*

According to Mother, she has completed her family service plan. Mother said she was unaware of the issues the Department had confirming her lease. Mother said she did not personally know the landlord and "actually found the place in a newspaper." Mother said she was not aware that she had any open warrants in Harris County.

Mother said she is currently employed at the Holiday Inn and generally works from 9:00 a.m. to 3:00 p.m. To maintain her sobriety, Mother said she works with her sponsor daily, writes in her journal, and attends meetings at least once a week. When asked about her "support system," Mother listed her "old boss," her grandma, her cousin, and her sponsor. Mother said all of these individuals were willing to assist her in caring for her children.

Mother agreed that the Foster Parents continued to be involved in her children's lives after the children were removed and returned to her care in 2017. Mother said the Foster Parents "had a bond" with the children and that she did not want to totally remove them from the children's lives.

Mother acknowledged that she had prior CPS cases "that have been opened and closed." Mother said the present case was different because she "actually

8

[has] a sponsor and [has] actually been working an honest program." Mother said she has been sober for approximately one-and-a-half years and has "learned different ways to cope with stress and stuff like that so that I do not relapse again."

Mother said she would be able to provide a safe home environment for Kate and Caleb if they were returned to her. Mother said she planned to enroll the children in the Livingston school district. If the children needed after-school care, Mother said she could arrange care with her grandmother or a friend. Mother said she currently rents a three-bedroom house with plenty of room for the children.

### Wilda Baptiste

Baptiste is Mother's sponsor and has worked with Mother for approximately two years. Baptiste said she is in "constant contact" with Mother and "communicate[s] with her about everything because being a sponsor, I have to know what's going on with her, as far as her life in general." Baptiste said she does not have any concerns about Mother maintaining her sobriety and said Mother is "doing a very excellent job." Baptiste said she did not have any concerns about Kate and Caleb being returned to Mother's care because Mother is "going to do whatever she ha[s] to do for her kids and to take care — take care of her kids and provide for her kids."

### Zachariah Robertson

Robertson previously hired Mother at La Quinta Inn & Suites, where Mother worked before her current job at the Holiday Inn. Robertson said he helped Mother obtain her current Holiday Inn position because it was "more financially stable than what [La Quinta] could offer at the moment."

Robertson said he never had any issues with Mother while she worked at La Quinta. According to Robertson, Mother "was one of the few people that I've ever

seen that actually kept up with me to the degree of work that I put in." Robertson said he never had any issues with Mother showing up late or missing work. Robertson said Mother worked in many different parts of the hotel, including the kitchen, housekeeping, and front desk.

### Kelli Knight

Knight is Mother's older sister. Knight lives in Mississippi and usually visits Mother "three or four times a year." However, Knight said she recently had a baby and had not been able to visit as often as she used to. But nonetheless, Knight testified that she is "available as a support system or as a resource for [Mother] in her time of need."

Knight said she believed that Mother is capable of caring for Kate and Caleb. Knight said Mother is "completely different than she was" and noted that Mother has been working every day and completing her counseling. But Knight acknowledged that "[i]t has been a pattern for [Mother] to use, get clean, and then use again."

### Foster Mother Patricia

Patricia said she first became involved with Mother in July 2017, when Mother's oldest son and Kate were placed in the care of her and her husband. Patricia said the children were returned to Mother in September 2018. After the children were returned to Mother, Patricia said she and Mother continued to "talk quite often." Patricia said she "started watching the kids again" in October 2018. When asked why Mother would drop the children off, Patricia said:

> It was a mixture of things. Sometimes it would be — [Mother] would say that she was stressed, she needed a break. Sometimes it would be . . . me calling and just checking on her to see how she's doing and it would turn into, you know, seeing [Kate] that weekend and picking her up that weekend.

Sometimes — it was mostly we'd pick [Kate] up Friday and then by Sunday, [Mother] would come and pick [Kate] up or sometimes it would extend further. There was several times where I would actually have to call in to work on, like, a Monday and I would have to find a babysitter for [Kate] because we would have her until, like, Tuesday or Wednesday.

Patricia said it got to the point where she and her husband were caring for the children "almost every weekend." But at other times, Mother would just "break communication" and they would not hear from her for weeks.

Patricia recalled several concerning incidents that took place while the children were living with Mother. In January 2019, Patricia said Mother called and said she took Kate to the emergency room. According to Patricia, Mother said Kate "had opened a bottle of thyroid pills and had possibly ingested 30 pills" and "had to have her stomach pumped." Patricia said Kate was two years old when this incident occurred.

A few days later, Patricia recalled receiving another call from Mother informing her that Caleb "had ingested [a] whole bottle of clove oil." Caleb's liver shut down and he was hospitalized for approximately a week. Caleb was one year old when this occurred.

Patricia said Caleb again was hospitalized in May 2020 after he cut his foot on a casserole dish that had fallen on the ground; the injury required 12 stitches. According to Patricia, Kate told her "that Mommy got mad and threw the dish and then [Caleb] had cut his foot."

Patricia recalled a separate incident in June 2020 when Mother failed to pick Kate and Caleb up from day care. According to Patricia, the day care called her at 8:30 p.m. and said they had been unable to get in contact with Mother. Patricia picked up the children from day care and informed the Department's caseworker

11

about what had occurred.

Patricia said Kate and Caleb were placed with her and her husband in August 2020, after the Department filed the underlying termination proceedings. The children underwent a "wellness check" and it was determined that Caleb was "behind on a lot of his vaccines and had to get vaccinated." Patricia also noticed that Caleb had "a little ball sticking out of his stomach" and appeared to be in pain when he "would stretch too high."

After taking Caleb to the pediatrician, Patricia said she was told he had an epigastric hernia. The pediatrician told Patricia the hernia previously had been noted in Caleb's medical records in March 2018 but had not been treated. Patricia said Caleb underwent surgery in February 2021 to repair the hernia.

Patricia said she also was concerned that Caleb was having repeated ear infections. After taking Caleb to the pediatrician, Patricia said she was told that Caleb previously had 11 ear infections while he was in Mother's care. Patricia said she scheduled ear tube surgery for Caleb.

Before Caleb got ear tubes, Patricia recalled that Mother "repeatedly sa[id] that she thought he was autistic" because he "was really bad and wouldn't listen." But after Caleb got ear tubes, Patricia said "it was like night and day" and Caleb started thriving. Instead of being autistic, Patricia said Caleb "just couldn't hear."

Turning to Kate, Patricia said she initially was "throwing a lot of tantrums" after she was removed from Mother's care. Patricia noted that Kate has been enrolled in speech, occupational, and social therapy, and has seen a lot of progress. Patricia recalled that Kate was having dental issues when she was removed from Mother's care and had 6-8 cavities. Patricia also said that Kate initially had "sleep issues" and would stay up "until about 2:00 or 3:00 in the morning."

Patricia said she was aware that Mother had a criminal history, specifically, "a lot of theft cases." Patricia said Mother would shoplift and "then give it to someone to sell." Patricia also knew that Mother was arrested in November 2019 for a drug offense.

Patricia said she and her husband intended to adopt Kate and Caleb if Mother's parental rights were terminated. Patricia said the children wanted to stay with her and her husband and rarely talked about Mother. At the time of trial, Patricia said Kate (who was then five years old) had lived with her and her husband for almost three years total. Patricia said Caleb (who was then four years old) had lived with her and her husband for 20 months.

For the children's short-term goals, Patricia said she wants to enroll them in sports; Kate expressed interest in dance and gymnastics and Caleb wanted to play football.

### Michaella Maniscalo

Maniscalo works for Child Advocates and has been involved in the case since July 2021. According to Maniscalo, she represents Kate's and Caleb's best interest.

Since she began working with the children, Maniscalo noted that she has seen significant progress. With respect to Kate, Maniscalo testified that she has "been more responsive to redirection than she used to be and more quick[] to say sorry to a sibling that she might be getting in a short argument with." Maniscalo said Caleb has become more outgoing and talkative.

Maniscalo testified that she did not believe that Mother "has the parental abilities to be able to parent the children" and noted Mother's "criminal history and drug abuse history." Maniscalo said she also was concerned with Caleb's prior

health issues, including the hernia that was diagnosed while he was in Mother's care and his repeated ear infections.

Maniscalo said that the Foster Parents can meet Kate's and Caleb's physical, emotional, educational, and medical needs. Maniscalo said she had observed "many" visits between the Foster Parents and the children and noted that the children are bonded to the Foster Parents and feel safe in their environment.

## II.    The Trial Court's Findings

The trial court signed a final order on June 9, 2022, terminating Mother's and Father's parental rights with respect to Kate and Caleb.

In its order, the trial court found that termination of Mother's parental rights was in the children's best interest and warranted under three subsections of section 161.001(b)(1) of the Texas Family Code:  (D) (endangerment by environment), (E) (endangerment by conduct), and (O) (failure to comply with a court ordered plan for reunification with the child).  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

The trial court also appointed the Department as Kate's and Caleb's sole managing conservator.  Mother timely appealed.[4]

### ANALYSIS

Mother raises five issues[5] on appeal that challenge:  (1) the sufficiency of the

---

[4] Father did not file a notice of appeal in the underlying proceeding.

[5] Specifically, Mother articulates her issues as follows:  (1) "Whether the Evidence is Factually Insufficient to Support Termination of Parental Rights Under 161.001(b)(1)(D)"; (2) "Whether the Evidence is Factually Insufficient to Support Termination of Parental Rights Under 161.001(b)(1)(E)"; (3) "Whether the Evidence is Legally and Factually Insufficient to Support Termination of Parental Rights Under 161.001(b)(1)(O)"; (4) "Whether the Evidence is Factually Insufficient to Support a Finding that Termination of Parental Rights is in the Best Interest of the Children"; and (5) "Whether the Trial Court Abused its Discretion by Failing to

evidence supporting the trial court's predicate findings under section 161.001(b)(1) and best-interest finding; and (2) the trial court's failure to appoint Mother as a possessory conservator.

We begin with the applicable burdens of proof and standards of review before turning to the issues raised on appeal.

## I. Burdens of Proof and Standards of Review

Involuntary termination of parental rights is a serious matter that implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). But although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). Given the fundamental liberty interests at stake, "termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20.

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Texas Family Code, and (2) termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re V.A.*, 598 S.W.3d 317, 327 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). For a legal sufficiency challenge, we consider all

Appoint Mother as a Possessory Conservator."

the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all controverting evidence a reasonable fact finder could disbelieve. *Id.*

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re C.H.*, 89 S.W.3d at 25. We examine whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *Id.*

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). "We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" *In re V.A.*, 598 S.W.3d at 328 (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003)).

## II. Predicate Termination Findings

In her first three issues, Mother asserts the evidence is factually insufficient to support the trial court's finding that termination was warranted under three subsections of section 161.001(b)(1) of the Texas Family Code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

### A. Governing Law

"To affirm a termination judgment on appeal, a court need uphold only one

16

termination ground — in addition to upholding a challenged best-interest finding — even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). Predicate findings under subsections (D) and (E), however, pose significant collateral consequences. *See id.* at 234, 235 (discussing section 161.001(b)(1)(M), which provides that a court may terminate a parent's rights if it finds, by clear and convincing evidence, that the parent has had his "parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"). In light of these consequences, we are required to consider the sufficiency of the evidence pursuant to subsections (D) and (E) when raised on appeal. *Id.* at 235; *see also, e.g.*, *In re P.W.*, 579 S.W.3d 713, 721, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Our analysis begins with the trial court's finding that termination is warranted under subsection (E).

Subsection (E) authorizes termination if the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). In this context, "endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *see also In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment"; therefore, it is not necessary that the conduct was directed at the child or that the child suffered actual injury. *In re M.C.*, 917 S.W.2d at 269.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct

17

result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Although endangerment under this subsection often involves physical endangerment, the statute does not require that the conduct be directed at a child or that the child actually suffer physical injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Id.* "As a general rule, subjecting children to a life of uncertainty and instability endangers the children's physical and emotional well-being." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

But termination under subsection (E) must be based on more than a single act or omission — "the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *In re V.A.*, 598 S.W.3d at 331; *In re S.R.*, 452 S.W.3d at 360. For this inquiry, we may consider conduct occurring both before and after the child was removed from the parent's care. *In re S.R.*, 452 S.W.3d at 360. We also may consider actions and inactions occurring both before and after the child's birth. *In re V.A.*, 598 S.W.3d at 331.

Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.R.*, 452 S.W.3d at 360-61. "Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being." *In re J.B.*, No. 14-20-00766-CV, 2021 WL 1683942, at *5 (Tex. App.—Houston [14th Dist.] Apr. 29, 2021, pet. denied) (mem. op.).

## B.    Application

Under the applicable standards of review, we conclude the evidence is factually sufficient to support the trial court's finding that Mother endangered Kate and Caleb as described in subsection (E).

18

First, the evidence shows that Mother has a lengthy history of substance abuse. *See In re J.J.L.*, 578 S.W.3d 601, 611 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being."). Testifying at trial, Jones said Mother initially came to the Department's attention in 2014; during the ensuing investigation, Mother tested positive for methamphetamines while pregnant with her oldest son and her son tested positive for methamphetamines when he was born. Jones said the Department initiated its fourth investigation in October 2017, when Caleb was born. According to Jones, Mother admitted to also using methamphetamines during her pregnancy with Caleb. *See In re M.J.*, No. 14-20-00449-CV, 2020 WL 7038526, at *6 (Tex. App.—Houston [14th Dist.] Dec. 1, 2020, no pet.) (mem. op.) ("a mother's drug abuse during pregnancy is particularly endangering to an unborn child's physical well-being").

Jones also testified about Mother's November 2019 arrest, during which the responding officers found "drugs [and] a loaded gun" in Mother's car. Mother was charged with possession with intent to deliver methamphetamines; she accepted a plea bargain mandating an eight-year probation and a $3,000 fine.

In her appellate brief, Mother points out that she has not had a positive drug test since April 2021 and has been working diligently with her sponsor. But this evidence alone does not fully discount the other evidence regarding Mother's history of substance abuse and its effects on the care she has provided her children. *See In re Z.H.*, No. 14-19-00061-CV, 2019 WL 2632015, at *4 (Tex. App.—Houston [14th Dist.] June 27, 2019, no pet.) (mem. op.) ("evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use"). Moreover, Sanders testified that Mother has

had a "pattern" of waiting until "the very last minute" to complete her services. "Eventually," Sanders said, Mother would "possibly relapse and get back to regular programming." Mother's sister also acknowledged that "[i]t has been a pattern for [Mother] to use, get clean, and then use again." *See also In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("evidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue").

Second, evidence was presented showing Mother's history of criminal conduct. *See In re S.R.*, 452 S.W.3d at 360-61. In addition to the November 2019 arrest for possession with intent to deliver methamphetamines, Jones said Mother was arrested in Oklahoma in June 2019 for larceny, assault, and trespassing. According to Sanders, Mother had an open warrant in connection with this offense that she had neglected to take care of until shortly before trial. Sanders said that, at the time of trial, Mother had two active warrants in Harris County.

Jones also testified that Mother "has [an] extensive criminal history involving theft offenses" and documents admitted into evidence showed that Mother has at least eight theft convictions. According to Patricia, Mother was involved in a scheme where she would shoplift goods and give them to someone else to sell.

Third, the evidence shows that both Kate and Caleb sustained serious injuries while in Mother's care. *See In re J.D.*, 436 S.W.3d 105, 114-15 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (history of repeated injuries to a child may support a finding that the child's caregiver allowed the child to remain in surroundings that endangered his physical well-being). According to Patricia, Kate was hospitalized in January 2019 when she was two years old. Patricia said Mother informed her that Kate "had opened a bottle of thyroid pills and had

20

possibly ingested 30 pills" and "had to have her stomach pumped." A few days later, one-year-old Caleb was hospitalized after Mother said he "had ingested [a] whole bottle of clove oil." Caleb's liver shut down and he was hospitalized for approximately one week. Caleb again was hospitalized in May 2020 after he cut his foot on a casserole dish that had fallen on the ground. According to Patricia, Kate relayed that this incident occurred when "Mommy got mad and threw the dish."

Fourth, the evidence shows that Kate and Caleb were dealing with several health issues at the time they were placed in the Foster Parents' care. *See In re S.B.*, No. 12-12-00402-CV, 2013 WL 2286081, at *8 (Tex. App.—Tyler May 22, 2013, no pet.) (mem. op.) (evidence that the child was "in poor health" supported finding that the parents engaged in an endangering course of conduct). Patricia said Caleb had an untreated hernia and at least 13 ear infections while he was in Mother's care. After Caleb underwent ear tube surgery, Patricia said the improvement in his hearing "was like night and day." With respect to Kate, Patricia said she had several cavities, sleep issues, and initially was "throwing a lot of tantrums."

Finally, other incidents and circumstances described by the witnesses' testimony further support the finding that Mother engaged a course of conduct that endangered Kate and Caleb. Jones described an incident in January 2020 when Mother traveled "in the middle of the night" to Mississippi to be with her husband, Yeager. At the time this occurred, Jones said Mother "was not supposed to be alone with the children" and "was not supposed to leave the state without notifying her caseworker." Jones also noted that Yeager had an extensive criminal history, including possession of a controlled substance and theft. Jones described a second 2020 incident in which Mother removed the children from the appointed Parental

Child Safety Placement and went to Huntsville.

Patricia testified that she and her husband provided care for Mother's oldest son and Kate from May 2017 through September 2018, after the children initially were removed from Mother's care. But even after they were returned to Mother's care, Patricia said Mother would ask the Foster Parents to watch the children; it eventually progressed to the point where the Foster Parents were watching the children "almost every weekend." Patricia recounted another incident in June 2020, in which Mother failed to pick Kate and Caleb up from day care. According to Patricia, the day care called her at 8:30 p.m. and said it had been unable to get in contact with Mother. Patricia picked the children up from daycare and informed the Department's caseworker of the incident.

Considered together, this evidence would allow the fact finder to form a firm belief or conviction that Mother engaged in a course of conduct that endangered Kate's and Caleb's physical or emotional well-being. *See* Tex. Fam. Code Ann. §§ 101.007, 161.001(b)(1)(E); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. Accordingly, the evidence is factually sufficient to support termination of Mother's parental rights under subsection (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

Because factually sufficient supports the subsection (E) termination finding, we need not address the trial court's finding pursuant to subsection (D). *See In re N.G.*, 577 S.W.3d at 232-33. Likewise, we need not address Mother's challenge to the trial court's finding pursuant to subsection (O). *See id*. We overrule Mother's first, second, and third issues.

## III. Best-Interest Finding

Mother also challenges the factual sufficiency of the evidence supporting the

trial court's finding that termination of her parental rights is in Kate's and Caleb's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2).

## A.    Governing Law

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). The factfinder may consider several factors to determine the child's best interest, including:  (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide a child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

**B.    Application**

Guided by the *Holley* factors, we conclude that the evidence is not factually insufficient to support trial court's finding that termination of Mother's parental rights is in Kate's and Caleb's best interest.  *See id.*

***Kate's and Caleb's desires and needs***.  When the children were removed from Mother's care in September 2020, Kate was almost four years old and Caleb was almost three.  At the time of the bench trial, Kate was five years old and Caleb was four.

When children are too young to express their desires, the fact finder may consider that the children are bonded with their current placement, are well cared for by them, and have spent minimal time with the parent.  *In re V.A.*, 598 S.W.3d at 333.  The evidence shows that these conclusions may be drawn here.  Numerous witnesses testified that Kate's and Caleb's physical and emotional well-being have significantly improved since they have been in the Foster Parents' care.  Jones said the Foster Parents have "provided a safe and stable environment" for the children and that the Department has not had any concerns about the care they have provided.  Similarly, Sanders said she has made numerous announced and unannounced visits to the Foster Parents and, each time, Kate and Caleb have been happy and well cared for.  Sanders said the children refer to the Foster Parents as "mom" and "dad" and "seem to love where they are."

Patricia also testified that Kate and Caleb are bonded to her and her husband.  According to Patricia, Kate had been living with her and her husband for over half of her life and Caleb had lived with the family for 20 months.

***Kate's and Caleb's present and future physical and emotional needs.***   The evidence at trial suggests that Mother was not meeting Kate's and Caleb's physical

and emotional needs while they were in her care.

As discussed above, when Caleb was placed in the Foster Parents' care he had numerous health issues, including an untreated hernia and frequent ear infections.

The evidence also suggests that Mother was not consistently providing for the children's emotional needs. Jones testified that Mother twice removed the children without permission: first, when she traveled with them to Mississippi and, second, when she removed the children from their Parental Child Safety Placement and moved them to Huntsville. Mother also would frequently leave the children in the care of the Foster Parents and once failed to pick the children up from day care. The trial court reasonably could conclude that this pattern of behavior would be damaging to the children's emotional needs.

In contrast, the evidence shows that the Foster Parents have adequately provided for Kate's and Caleb's physical and emotional needs. Patricia testified that, since he was removed from Mother's care, Caleb has had surgery for his hernia and ear tube surgery. Jones, Sanders, and Maniscalo each testified that the Foster Parents can provide Kate and Caleb with a stable environment and provide for the children's needs.

***Present and future emotional and physical danger to Kate and Caleb.*** The evidence suggests that returning Kate and Caleb to Mother's care would endanger their physical and emotional health. As analyzed above with respect to the trial court's subsection (E) finding, the evidence supports the finding that Mother engaged in a course of conduct that endangered Kate's and Caleb's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *see also In re V.A.*, 598 S.W.3d at 333 ("Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that

25

termination is in the child's best interest."). Based on the evidence presented at trial, the trial court reasonably could conclude that this pattern of behavior would continue into the future.

***Plans for Kate and Caleb and stability of proposed placement.*** Jones, Sanders, and Maniscalo each testified that it would be in Kate's and Caleb's best interest if Mother's parental rights were terminated so they could be adopted by the Foster Parents. Emphasizing the consistent care provided by the Foster Parents, Jones said "they have always been there, even picked up the children when Mom was not available and they were left at daycare." Similarly, Sanders noted the Foster Parents' "concern about the children's well-being, their future endeavors and just their stability."

***Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate and any excuses for those actions and omissions.*** As discussed above in section II.B., Mother has an extensive criminal history and a record of substance abuse. Mother also has been an inconsistent presence throughout the children's lives and has repeatedly continued to leave them with the Foster Parents even after they were back in her custody. The record does not contain any evidence of factors that mitigate these acts and omissions.

***Conclusion.*** Based on this evidence, a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's parental rights was in Kate's and Caleb's best interest. *See* Tex. Fam. Code Ann. §§ 101.007, 161.001(b)(2). We overrule Mother's fourth issue.

## IV.  The Trial Court's Failure to Appoint Mother as a Possessory Conservator

In her fifth issue, Mother asserts the trial court erred by failing to appoint her as the children's possessory conservator. Mother cites Texas Family Code section

153.191 to support this contention, which states:

> The court shall appoint as a possessory conservator a parent who is not appointed as a sole or joint managing conservator unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child.

*Id*. § 153.191. Mother asserts that the evidence "conclusively demonstrates that awarding Mother access and possession would not endanger the children's physical or emotional welfare."

A conservatorship determination made pursuant to section 153.191 is reviewed for an abuse of discretion. *See Brandon v. Rudisel*, 586 S.W.3d 94, 106-07 (Tex. App.—Houston [14th Dist.] 2019, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Id*. at 102.

Under section 153.191, the trial court shall appoint a parent as a possessory conservator unless the court finds that the appointment (1) is not in the best interest of the child, and (2) would endanger the physical or emotional welfare of the child. Tex. Fam. Code Ann. § 153.191. Here, the evidence supports the trial court's implied finding that appointing Mother as a possessory conservator would not be in Kate's and Caleb's best interest and would endanger their physical or emotional welfare.

As discussed above, the trial court found that (1) Mother engaged in conduct that endangered Kate's and Caleb's physical or emotional well-being, and (2) termination of Mother's parental rights is in Kate's and Caleb's best interest. *See id*. § 161.001(b)(1)(E), (b)(2). We reviewed the record and concluded that these findings are supported by the evidence presented at trial. This evidence likewise supports the trial court's best-interest and welfare findings pursuant to

section 153.191.  Therefore, the trial court did not abuse its discretion in concluding that Mother did not make the showing required under section 153.191 to establish her rights as a possessory conservator.  *See id.* § 153.191.

We overrule Mother's fifth issue.

**CONCLUSION**

We conclude that the evidence is not factually insufficient to support the trial court's section 161.001(b)(1)(E) and best-interest finding.  We also conclude that the trial court did not err by failing to appoint Mother as Kate's and Caleb's possessory conservator.  Therefore, we overrule Mother's issues on appeal and affirm the trial court's June 9, 2022 final order.

/s/  Meagan Hassan
    Justice

Panel consists of Justices Zimmerer, Spain, and Hassan.